# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ROANOKE DIVISION

|  |  |  |
|---|---|---|
| **LEROY A. LOVELACE**, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 7:07CV00506 |
| | ) | |
| v. | ) | **OPINION** |
| | ) | |
| **KATHLEEN BASSETT, ET AL.,** | ) | By: James P. Jones |
| | ) | Chief United States District Judge |
| Defendants. | ) | |

*Leroy A. Lovelace, Plaintiff Pro Se; Mark R. Davis, Senior Assistant Attorney General of Virginia, Richmond, Virginia, for Defendants.*

In this civil rights action, a Nation of Islam inmate asserts that being offered fewer total calories per day by state prison authorities during the month-long Ramadan observance in 2005 substantially burdened the exercise of his faith. Since 2005, the prison authorities have changed their policy and Ramadan observants now receive the same total calories per day as other inmates. Upon consideration of the defendants' Motion for Summary Judgment, and based upon the evidence presented, I find that the plaintiff's claim for injunctive relief is moot, in light of the change in policy, and his claim for monetary damages otherwise fails.

I

The plaintiff, Leroy A. Lovelace, is confined in the Keen Mountain Correctional Center ("KMCC"), a state prison located in this judicial district. He

participates in the so-called Common Fare religious diet program operated by the Virginia Department of Corrections ("VDOC").[1]

Ramadan is the ninth month of the Arabian lunar calendar, when practicing Muslims like Lovelace are required to fast during daylight hours for thirty consecutive days. This religious practice does not limit food consumption between sunset and dawn. In the years 2001 through 2004, before the Ramadan fast began, Lovelace met with Mike Oslin, the food service director at the prison, seeking permission for Ramadan participants to receive their pre-packaged Common Fare lunch meals after sundown, along with their dinner meals. Each year Oslin refused Lovelace's request and the prison provided Ramadan participants with a breakfast meal before sunrise and a supper meal after sunset.

Again in 2005, Lovelace asked Oslin to serve the lunch meal after sundown during Ramadan or to have the breakfast or supper Common Fare meals supplemented with additional calories. Again, Oslin refused. Lovelace contends that the two meals per day provided him with approximately 1500 daily calories during Ramadan. Once the fast began, Lovelace raised the issue through the first two levels of the VDOC administrative remedies procedures without success.

As a result of obtaining fewer calories every day for thirty days during Ramadan 2005, Lovelace allegedly lost ten pounds, suffered unrelieved hunger and "hunger headaches," and had trouble sleeping. His spiritual experience also allegedly

---

[1] A Common Fare program provides meals that allow inmates of varying religious faiths to share a common diet, by providing foods that accommodate all of the faiths. *See Patel v. U.S. Bureau of Prisons*, 515 F.3d 807, 810-11 (8th Cir. 2008) (describing program).

- 2 -

suffered because his hunger distracted him from his reading and praying, as did the "contentious exchanges" with staff about the Common Fare meals during a time when Muslims are to seek peace and avoid arguments and disputes. He asserts that he was substantially pressured to break his fast in violation of his faith in order to satisfy his physical hunger.

Lovelace agrees that after the first day of Ramadan 2006, he and other Ramadan participants that year received approximately 2500 calories per day, pursuant to an order of this court in the case of *Couch v. Jabe*, No. 7:05CV00642 (W.D. Va. Mar. 19, 2007). Moreover, pursuant to a settlement agreement reached in that case, Ramadan participants in 2007 received a total of 3000 calories each day of the fast. The settlement agreement provided that "the total calories and nutrition provided in the meals to [fasting] inmates will equal or exceed that provided to non-fasting inmates during the same period." (Pl.'s Resp. Mot. Dismiss 7 n.1.)

In his present suit, Lovelace names as defendants Oslin, as well as Kathleen Bassett, the warden at KMCC, and Larry Huffman, a regional director of VDOC, claiming that their actions—depriving him of adequate calories during Ramadan 2005—violated his rights under the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C.A. §§ 2000cc to 2000cc5 (West 2003), and the Constitution. He seeks monetary damages against each defendant, as well as

- 3 -

declaratory and injunctive relief. The defendants have moved for summary judgment in their favor and the plaintiff has responded.[2] The motion is now ripe for decision.[3]

In support of their present Motion for Summary Judgment, the defendants have presented the affidavit of Linda Shear, dietician for VDOC, concerning state-wide policy as to the Common Fare diet and accommodations to be made for inmates observing Ramadan. According to its 2004 Food Service Manual, also referred to as DOP 601, VDOC institutions were required to provide a specially planned diet that reasonably accommodated inmates whose religious beliefs require them to celebrate the annual Ramadan fast. The Ramadan menu was set at VDOC headquarters and was not to be changed at the institutional level.[4]

---

[2] The defendants previously filed a Motion to Dismiss, which I denied. *Lovelace v. Bassett*, No. 7:07CV00506, 2008 WL 4452638 (W.D. Va. Sept. 27, 2008)

[3] In his response to defendants' motion, Lovelace also argues an Eighth Amendment claim. He relies on *Campbell v. Cauthron*, 623 F.2d 503, 508-09 (8th Cir. 1980), a decision finding that by providing a nutritionally inadequate diet for inmates, a local jail was violating the Eighth Amendment prohibition against cruel and unusual punishment. In his own case, however, Lovelace fails to allege facts stating an Eighth Amendment claim for two reasons. First, even assuming for purposes of this opinion that he lost ten pounds during Ramadan on the two-meal system, he fails to demonstrate how any reasonable jury could find that the reduction in calories during Ramadan caused him any significant or serious physical injury. *See Strickler v. Waters*, 989 F.2d 1375, 1380-81 (4th Cir. 1993). Second, the regular inmate diet at KMCC, providing inmates with 2800 calories per day, was always available to him. Instead, he chose to continue receiving the two Common Fare meals provided during Ramadan. The defendants thus did not punish him by giving him a choice of diets. To the extent that Lovelace claims inadequate calories in the two-meal Ramadan diet violated other rights aside from those guaranteed by the Eighth Amendment, I will address the matter elsewhere in this Opinion.

[4] Lovelace contests this statement of VDOC policy and submits another inmate's affidavit stating that in 2005, participants of Ramadan at another VDOC institution, Red Onion State Prison, received all three Common Fare meals each day.

- 4 -

According to Shear, in 2005 and 2006, the three daily meals on the Common Fare menu provided an average total of 2742 calories per day. The combined caloric average of the breakfast and dinner Common Fare meals was 1800 calories. Accordingly, Ramadan participants on the Common Fare diet, receiving only their breakfast and dinner meals, ingested up to 1800 calories daily. Shear offers her opinion as a licensed dietician that consuming only 1800 calories per day "would not have presented a health hazard to a healthy person." (Shear Aff. ¶ 11.)

Shear explains in general terms how and why VDOC accommodations of Ramadan participants' dietary needs changed in 2007:

> Prior to the 2007 Ramadan observance, personnel responsible for planning the [Ramadan] diet were under the impression that a fast meant a reduction in food intake and not just refraining from eating during the daylight hours. Consequently, inmates observing Ramadan in 2005 and 2006 were provided only the breakfast and dinner meals. In 2007, VDOC personnel determined that the Ramadan fast meant refraining from eating during the daylight hours, with no religious limit on consumption of food while the sun is down. The Ramadan menu was changed in 2007 to include the addition of a third meal which is bagged and served with the dinner meal to be eaten sometime after the dinner meal and before the next breakfast meal. The total daily caloric value for the Ramadan menu is now equal to the Master Menu.
>
> . . . .
>
> The only reason that inmates who participated in the Ramadan fast were not provided a third bag meal is due to a lack of an understanding of the essentials of the Ramadan fast.

(*Id.* ¶ 10-11.)

There is also submitted the affidavit of defendant Warden Bassett. Bassett states that the observance of 2005 Ramadan started on the evening of October 5, 2005, and ended on the evening of November 4, 2005. On October 21, 2005,

- 5 -

Lovelace filed a regular grievance complaining that he had received only two Common Fare meals every day of Ramadan thus far, instead of the three daily meals provided by the normal Common Fare menu. He claimed that this "starvation diet" of only "1900" calories per day should be supplemented to raise his daily caloric intake to the usual 2800 calories per day. Bassett responded that pursuant to DOP 601, the planned Common Fare menu could not be changed at the institutional level, but that Common Fare participants could choose to receive the Ramadan meals from the regular menu instead of the breakfast and dinner Common Fare meals. Bassett indicated that on September 21, 2005, Lovelace signed a request to continue his Common Fare meals during Ramadan.

The affidavit of defendant Oslin, food operations director at KMCC since 1990, states that prior to Ramadan, he meets with the inmate representatives to discuss the timing and location of the meals provided for these observances. Oslin states:

> As the menu is pre-set by the VDOC Dietician, there is little discussion of the menu with the inmates. I do not recall discussing a third meal option with Lovelace. However, had he made this request, I would have informed him that I am required to follow the pre-planned menu. I had no authority to grant Lovelace's request.

(Oslin Aff. ¶ 8.)

The affidavit of KMCC Head Nurse Whited presents a summary of Lovelace's medical records with regard to weight changes. When Lovelace first arrived at KMCC in April 2001, he weighed 196 pounds. Lovelace was not seen or weighed by medical staff during Ramadan 2005, celebrated between October 5 and November

- 6 -

4, 2005, and Whited found no indication that he requested any medical attention during this period. Whited states that on May 11, 2005, medical staff weighed Lovelace at 194 pounds, and on March 6, 2006, at 200 pounds. Lovelace does not dispute these numbers.

## II

Before reaching the merits of Lovelace's case, I must resolve two litigation disputes, the first relating to discovery, and the other resulting from the use by the defendants of Lovelace's medical records.

### A

Lovelace filed his response to defendants' Motion for Summary Judgment on November 18, 2008, including numerous attachments. On December 2, 2008, he filed a Motion to Compel, seeking to obtain copies of the Common Fare nutritional analysis and DOP 601. Defendants objected to both requests. They argued that Lovelace clearly had access to DOP 601 through other means, since he submitted a copy of the policy with his response to their summary judgment arguments. They objected to providing the nutritional analysis for reasons related to orderly prison administration. Specifically, they present evidence that it is standard VDOC procedure not to release the nutritional analysis of VDOC menus to any inmate, because the analysis (like the menu) is subject to frequent changes, must be requested through the VDOC dietician, and may be misused by inmates to spread confusion when meals on the analysis do not match the meal actually provided.

- 7 -

Lovelace argues that he needs the nutritional analysis in order to dispute Shear's estimates of calorie comparisons between the different VDOC diets. I find the prison's interests outweigh an inmate's interest in possessing his own copy of the nutritional analysis. Moreover, I find that the dispute over the number of calories provided in the two-meal Ramadan accommodation is not material to disposition of Lovelace's claims. Because it is also clear that Lovelace had access to DOP 601 outside the discovery process, I will sustain defendants' objections and deny the motion to compel.

In April 2009, Lovelace submitted copies of interrogatories he had recently served on the defendants. Lovelace offered no indication in his November 2008 response to defendants' summary judgment motion that he wished to engage in additional discovery. Moreover, he fails to present with his interrogatories the affidavit required under Rule 56(f) of the Federal Rules of Civil Procedure, setting out specific reasons why this discovery is necessary to his ability to respond fully to defendants' motion. In addition, I have reviewed his interrogatories and find them to be argumentative and unnecessary to resolution of the legal issues to be addressed on summary judgment. Accordingly, I do not find that he is entitled to this discovery before the court rules on the Motion for Summary Judgment.

### B

Lovelace filed a motion for sanctions against defense counsel, pursuant to Rule 11(b) of the Federal Rules of Civil Procedure, based on the defendants' submission of portions from his prison medical records in support of their Motion for Summary

Judgment. Specifically, Lovelace complains that counsel for the defendants conspired with Nurse Whited to obtain Lovelace's medical records outside the normally required discovery methods and without the protections mandated under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), 42 U.S.C.A. §§ 1320d-1 to 1320d-9 (West 2003 & Supp. 2009). He further claims that the submitted records include sensitive information regarding health testing for communicable diseases that might cause him harm in some unidentified way if it fell into the hands of other inmates. Lovelace seeks to have the medical information stricken from the docket, to require counsel for defendants to show "good cause" for "confiscati[ng]" the medical records and making them "available as a public record by filing them with the Court," to have sanctions imposed against counsel, and to obtain "any other relief that this Court deems appropriate." (Mot. Sanctions 2.)

In response, the defendants contend that they were within their rights to submit medical record evidence in response to Lovelace's claim for damages based on his alleged weight loss of ten pounds during Ramadan as a result of the two-meal plan. Counsel also asserts that the state agency responsible for providing medical treatment to Lovelace "has every right to share information with the Office of the Attorney General, when the information in the records relates to a legal matter of importance to the agency or its individual employees." Counsel further argues that in such in-house exchanges of information, an intermediate requirement for counsel to obtain a subpoena would serve no public purpose and would only increase the difficulty the Attorney General faces in providing legal representation to VDOC. In this case,

counsel explains, the records submitted to support Nurse Whited's affidavit concerning Lovelace's weight fluctuations do contain other medical information not relevant to the claims in this action; however, the records were offered in unredacted form to deflect any protest that they were incomplete and not out of any intention to disclose sensitive information about Lovelace's health.[5]  Finally, the legal position of the Office of the Virginia Attorney General is that HIPAA does not apply to VDOC, because this state agency is not engaged in electronic records keeping.

Upon review of the parties' submissions, I find that the motion for sanctions under Rule 11(b) must be denied.  Rule 11 provides that when submitting pleadings, motions, or other documents to the court, counsel "certifies" that to the best of his knowledge, the document is not presented for any improper purpose, contains claims or defenses warranted under the law, and includes only facts or denials that are supported by evidence or likely to be supported after appropriate investigation.  Fed. R. Civ. P. 11(b).

Other than his own speculation of a conspiracy, Lovelace offers no evidence whatsoever that any of the records submitted in support of the nurse's affidavit are inaccurate or offered for any improper purpose.  Rule 11 does not authorize imposition of sanctions based on counsel's failure to comply with state discovery statutes.  In any event, I find merit in counsel's argument that he properly obtained Lovelace's records through inter-departmental procedures as necessary to present a

---

[5]  Lovelace has not identified any particular information revealed in the records or explained how this information could be used against him by other inmates.

defense for VDOC employees in response to Lovelace's claims of weight loss and hunger headaches.

I also find no ground on which sanctions are appropriate in this situation under HIPAA. This Act does not create a privilege for patient medical information or completely bar the disclosure of this information in the context of litigation. *See Nw. Mem'l Hosp. v. Ashcroft*, 362 F.3d 923, 925-26 (7th Cir. 2004). Likewise, HIPAA does not impose state evidentiary privileges or procedures on suits to enforce federal law. *Id.* at 925. Rather, HIPAA provides that protected patient medical information can be disclosed in judicial or administrative proceedings upon entry of a protective order approved by the court. *See* 45 C.F.R. § 164.512(e)(1) (2009). Whether or not VDOC is an entity to which HIPAA applies, I find that Lovelace's interests in the medical records in question can be adequately protected by entry of an order directing that the medical records now on the court's electronic docket be placed and maintained under seal. *See, e.g., United States v. Bek*, 493 F.3d 790, 802 (7th Cir. 2007) (holding that the requirements of 45 C.F.R. § 164.512(e)(1) were satisfied where the trial court entered an appropriate protective order following the seizure of the subject records).

III

Summary judgment is proper where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. Upon motion for summary judgment, the court must view the facts, and the

- 11 -

inferences to be drawn from those facts, in the light most favorable to the party opposing the motion. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). Rule 56(c) mandates entry of summary judgment against a party who "after adequate time for discovery and upon motion . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A genuine issue of material fact exists if reasonable jurors could find by a preponderance of the evidence that the nonmoving party is entitled to a verdict in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). When a motion for summary judgment is made and properly supported by affidavits, depositions, or answers to interrogatories, the non-moving party may not rest on the mere allegations or denials of the pleadings. Fed. R. Civ. P. 56(e). Instead, the non-moving party must respond by affidavits or otherwise and present specific facts from which a jury could reasonably find for his side. *Anderson*, 477 U.S. at 256-57.

A.  RELIGIOUS EXERCISE.

The United States Court of Appeals for the Fourth Circuit recently held that RLUIPA does not authorize claims for money damages against an official who is sued in her individual capacity in reliance on the Spending Clause facet of the statute. *Rendelman v. Rouse*, 569 F.3d 182, 189 (4th Cir. 2009). Because the *Rendelman* plaintiff did not advance any claim under the Commerce Clause facet of RLUIPA, however, the Fourth Circuit left open the question of whether claims for monetary damages might be authorized in that context against an official in her individual

- 12 -

capacity. *Id.* Accordingly, I will analyze Lovelace's RLUIPA claims along with his Free Exercise claims, with the understanding that his RLUIPA claims for monetary damages against the defendants in their individual capacities are foreclosed to the extent that he raises them in reliance on VDOC's receipt of federal funding.

A prisoner has a right under the Free Exercise Clause of the First Amendment and under RLUIPA to receive a diet consistent with his sincerely held religious scruples. *Lovelace v. Lee*, 472 F.3d 174, 198 (4th Cir. 2006) (RLUIPA) (*Lovelace I*); *Ross v. Blackledge*, 477 F.2d 616, 618-19 (4th Cir. 1973) (First Amendment). In deference to the expertise of prison administrators in managing the difficult challenges of incarceration, however, even a prison policy that substantially burdens an inmate's ability to practice his religious beliefs withstands a constitutional challenge so long as it is rationally related to a legitimate governmental interest. *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349 (1987); *Turner v. Safley*, 482 U.S. 78, 89-91 (1987). A "substantial burden" is one that puts "substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Thomas v. Review Bd. of Ind. Employment Sec. Div.*, 450 U.S. 707, 718 (1981).

Under *Turner,* the court must consider four factors in addressing an inmate's constitutional claim: (1) whether there is a "valid, rational connection" between the regulation and a legitimate and neutral governmental interest; (b) whether there are alternative means of exercising the asserted constitutional right that remain open to inmates; (c) whether the extent to which accommodation of the asserted right will have an impact on prison staff, on inmates' liberty and on the allocation of limited

- 13 -

prison resources; and (d) whether the regulation represents an "exaggerated response" to prison concerns. *482 U.S.* at 89-91

RLUIPA prohibits governments from taking actions that impose a "substantial burden on the religious exercise of a person residing in or confined to an institution," unless the government demonstrates that imposition of that burden furthers "a compelling governmental interest" by "the least restrictive means." 42 U.S.C.A. § 2000cc-1(a)(1)-(2). Under RLUIPA, the inmate plaintiff bears the burden of proving that the challenged prison practice or lack of religious accommodation places a substantial burden on his exercise of sincere, religious beliefs. § 2000cc-2(b). Once a plaintiff carries this burden, the government must prove that the imposition of the burden (or refusal to accommodate plaintiff's belief) furthers a compelling interest by the least restrictive means. *Id.* RLUIPA does not define "substantial burden." The Fourth Circuit has adopted the *Thomas* definition of the term. *Lovelace I*, 472 F.3d at 187 (quoting *Thomas*, 450 U.S. at 718) ("a substantial burden on religious exercise occurs when a state or local government through act or omission 'put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs'"). *See also Couch v. Jabe*, 479 F. Supp. 2d 569, 589 (W.D. Va. 2006) (denying motion to dismiss in case filed by Lovelace's cellmate at KMCC by holding that "a reasonable jury could find that inmates participating in the [Ramadan] fast [in 2004], receiving only 1000 daily calories, were substantially pressured to break the fast, in violation of Islamic tenets, in order to satisfy their physical hunger").

- 14 -

The defendants assert that Lovelace fails to present any evidence as to how missing his lunch every day for a month "put substantial pressure" on him to "modify his behavior" in violation of his Ramadan beliefs. They argue that he knew from his participation in Ramadan 2004 that he would receive only two meals per day during Ramadan 2005, but chose to apply to celebrate Ramadan 2005 under those conditions. They present Shear's affidavit, indicating that Lovelace received an average of 1800 calories per day during the thirty days of Ramadan, a caloric intake which, in Shear's professional opinion as a licensed dietician, did not put him at any risk of suffering adverse health consequences. Lovelace asserts that he was given only 1500 calories per day during Ramadan 2005 as compared to the 2500 daily calories normally provided by the Common Fare meals.

I find that the dispute over the number of calories (1500 or 1800) is not significant enough to be material under Rule 56(c). The parties agree that during Ramadan 2005, Lovelace received approximately 1000 fewer calories per day than he normally received. He alleges that this difference in calories caused him hunger pains and "hunger headaches" during the day that distracted from his religious observance and that the reduction in calories was not required by his beliefs. The defendants' evidence that the drop in caloric intake did not pose a health hazard, result in significant weight loss, or cause Lovelace to seek medical attention does not refute his allegation that his religious observance was substantially burdened by his hunger. A reasonable jury could find that requiring him to endure this level of bodily discomfort in order to observe Ramadan put substantial pressure on Lovelace to

- 15 -

forego his celebration of the fast in order to avoid that discomfort. Therefore, I find that the defendants are not entitled to summary judgment on the ground that the two-meal Ramadan plan did not substantially burden Lovelace's exercise of his religious beliefs.[6]

The evidence establishes, however, that the defendants Lovelace has sued—Bassett, Oslin, and Huffman—had no personal involvement in creating the two-meal Ramadan plan in effect in 2005 and had no authority to change it. The 2004 Food Service Manual mandated the two-meal plan and forbade any changes being made to the procedure at the institutional level.

Lovelace argues that the defendants should have countermanded VDOC policy once he informed them that his beliefs did not require any reduction in calories during Ramadan. The mere fact that at another Virginia prison officials chose to act outside the VDOC Ramadan policy and provide Islamic inmates with three Common Fare meals during the fast in 2005 does not prove that KMCC officials' failure to do so represented a separate violation of Lovelace's rights under RLUIPA or the Constitution. If Lovelace suffered a violation of his rights here, it occurred because of the policy and not because of the defendants' refusal to ignore the policy.

Lovelace also contends that even if the defendants could not correct the Ramadan diet problem themselves, they had some duty to pass the information up the VDOC administrative chain of command to officials who could act on it. I cannot

---

[6]  In response to the RLUIPA claim, the defendants do not argue that they had any compelling interest furthered by the two-meal plan or that it was the least restrictive means of accommodating Lovelace's Ramadan practice. They do not assert any adverse impact on prison resources associated with providing three meals instead of two during Ramadan.

Case 7:07-cv-00506-JPJ-mfu   Document 33   Filed 09/29/09   Page 16 of 27   Pageid#: 297

agree. The defendants' grievance responses informed Lovelace that the two-meal plan came from VDOC headquarters, so that he himself could take appropriate measures to pass on the information to policy makers.[7] The defendants had no constitutional duty to advocate for him against an established prison policy. It is undisputed that the defendants Lovelace has named are not the individuals at VDOC who implemented the challenged policy in this case and who had the authority to alter it; therefore, these defendants are entitled to judgment as a matter of law as to Lovelace's claims under the First Amendment and RLUIPA. *See Lovelace I*, 472 F.3d at 193 (finding that assistant warden could not be liable for institutional policy that allegedly violated RLUIPA, since it was the warden who issued it).

Lovelace is litigating pro se. Therefore, if I find that his allegations state a meritorious claim regarding his religious diet during Ramadan 2005, I have an obligation to grant him a reasonable opportunity to identify the correct person or persons against whom such a claim would be properly asserted. *Gordon v. Leeke*, 574 F.2d 1147, 1151 (4th Cir. 1978).

In this case, however, I do not find that Lovelace has alleged facts on which he could prove a meritorious religious exercise claim against anyone. First, both RLUIPA and the Free Exercise Clause require the court to defer to the expertise of prison officials in matters of prison administration. *See Cutter v. Wilkinson*, 544 U.S. 709, 723 (2005) (RLUIPA) ("[Lawmakers supporting RLUIPA] anticipated that

---

[7] Defendants do not argue that Lovelace failed to exhaust his administrative remedies before bringing this lawsuit, pursuant to 42 U.S.C.A. § 1997e(a) (West 2003).

courts would apply the Act's standard with due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources." ) (omitting internal quotations); *O'Lone*, 482 U.S. at 349 (Free Exercise). The administrative decision to standardize accommodation of inmates' religious dietary needs throughout the VDOC rather than allowing individual officials at each institution to adjust inmates' religious diets at will is just the kind of prison policy-making determination to which courts must defer.

Second, Lovelace simply fails to allege any facts upon which a jury could find that the VDOC officials who created the two-meal policy acted with the requisite intent such that they could be held personally liable for that policy. *See Lovelace I*, 472 F.3d at 194. Lovelace offers no evidence whatsoever refuting defendants' affidavit evidence that the two-meal Ramadan plan resulted from VDOC officials' incomplete understanding of the Ramadan fast itself. They believed that a reduction in food intake was part of the observance of the fast. Lovelace establishes that he informed KMCC officials and even the regional director that Islam does not limit the consumption of food while the sun is down during Ramadan. He does not, however, offer any evidence that he pursued a grievance or wrote a letter relaying this information to administrators at VDOC headquarters who were in a position to amend the DOP regarding Common Fare meals during Ramadan.

- 18 -

In addition, the detailed nature of the policies that tSeptember 29, 2009he VDOC has issued regarding Common Fare and Ramadan procedures—in 2004 and then in 2007—indicates prison officials' intentions to meet fully their federal constitutional and statutory obligations to accommodate Islamic inmates' religious dietary beliefs. For example, the procedures in place in 2005 required prison officials to make clearly inconvenient changes to staffing and scheduling in order to create separate meal serving times for one group of inmates for one month of the year. These accommodations were much more onerous than providing inmates with that third Common Fare meal all month. By contrast, defendants expressly do not argue that providing a third meal to Ramadan participants in 2005, as they have since then, would have adversely impacted the allocation of prison staffing or resources. Rather, the failure to provide the third meal during earlier Ramadan observances occurred only because VDOC decision makers simply did not realize that in this one respect, the accommodation they had designed was inconsistent with Islamic beliefs.

The evidence supports, at the most, a finding that unnamed VDOC officials acted negligently in researching Ramadan practice and in designing the accommodation policy that VDOC institutional employees were required to follow in October 2005. Negligent conduct by individual prison officials that substantially burdens inmates' religious exercise is not actionable under RLUIPA or the Free Exercise Clause against officials in their individual capacities. *Id.* at 194-95, 201.

Lovelace has also made a demand for injunctive relief, requiring prison officials to change the Ramadan Common Fare menu to ensure that participants

- 19 -

receive meals between sundown and sunrise that are equivalent to the three meals normally required under the Common Fare contract. Such a claim against VDOC administrators in their official capacities would be actionable under RLUIPA and the First Amendment. *Id.* at 193-94, 200.

However, I find that Lovelace's claim for injunctive relief is moot, because the VDOC Ramadan policy has already been changed to address his concern. The new policy, issued in November 2007, expressly states that: (1) inmates on the Common Fare diet who register to participate in Ramadan may elect to "remain on the Common Fare diet" during that period or elect to eat from a special Ramadan menu designed by the VDOC dietician; and (2) each Ramadan participant is to receive his breakfast meal before sunrise and his dinner meal and a third "bagged meal" after sunset (Pl.'s Resp. Ex. D, ¶ ¶ M(3), VI(F)(3).) This policy does not leave room for some future KMCC warden to interpret its provisions so as to cut out Common Fare lunches during Ramadan, as Lovelace fears. Therefore, I find no justification for allowing Lovelace to amend his religious exercise claims to name as defendants the VDOC officials who implemented the two-meal Ramadan plan and had the authority to change it,[8] and I will dismiss his claim for injunctive relief as moot.

---

[8] Based on my finding that Lovelace simply does not establish any claim under RLUIPA or the First Amendment, I need not address defendants' separate argument that his claims for damages are barred under 42 U.S.C. § 1997e(e) (West 2003).

B. DUE PROCESS.

Lovelace also claims that the defendants deprived him of a liberty interest without adequate procedural protection in violation of the Fourteenth Amendment. To succeed on this procedural due process claim, Lovelace must show that

> he was denied a liberty interest protected by the Due Process Clause, an interest that can arise either from the Constitution itself or from state laws or policies; this denial imposed on him an "atypical and significant hardship in relation to the ordinary incidents of prison life"; and the process that the state prison employed was constitutionally inadequate.

*Lovelace I* , 472 F.3d at 202 (omitting citations to *Wilkinson v. Austin*, 545 U.S. 209, 220-221 (2005); *Sandin v. Conner*, 515 U.S. 472, 484 (1995)). I find, as did this court in his previous case, that Lovelace "has a liberty interest in observing the Ramadan fast, derived from his constitutional free exercise right." *Lovelace v. Lee*, No. 7:03CV00395, 2007 WL 2461750, at *20 (W. D. Va. 2007) ("*Lovelace II*") (Kiser, J.). Given defendants' admission that Lovelace received one-third fewer calories per day for the month of Ramadan 2005 than inmates on the regular Common Fare Diet received during the same period, I also find that he has demonstrated an "atypical and significant hardship" under *Sandin*, 515 U.S. at 484. I do not find, however, that the existing grievance procedures are constitutionally inadequate to protect his interests.

A comparison with Lovelace's previous lawsuit is instructive. In that case, Lovelace alleged that a correctional officer had incorrectly reported seeing Lovelace violating the prison's Ramadan procedures, and as a result of this false accusation, Lovelace was precluded from participating in the Ramadan meals and other religious

- 21 -

services for the duration of the Ramadan observance. *Lovelace I*, 472 F.3d at 181-82. The district court granted summary judgment for defendants, but the Fourth Circuit reversed and remanded the case for further development of several issues, including Lovelace's claim that the prison's grievance system provided inadequate procedural protection against the erroneous deprivation of his liberty interest in practicing Ramadan rites. *Id.* at 202-03. In *Lovelace II*, this court found that the existing grievance procedures provided an adequate mechanism for resolution of Lovelace's claims in that case, pursuant to the balancing test under *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). 2007 WL 2461750, at *21.

Under *Mathews*, the court must test the adequacy of the procedures in place by balancing three factors: (1) the private interest affected by the official action; (2) the risk of erroneous deprivation under existing procedures and the likely benefit, if any, of alternative or additional procedures; and (3) the state's interests, including allocation of resources, maintaining order, security and discipline, and other issues of prison administration. *Lovelace*, 472 F.3d at 202. *See also Wolff v. McDonnell*, 418 U.S. 539, 556 (1974) (recognizing that there must be "mutual accommodation" between institutional needs and inmates' constitutional protections).

In *Lovelace II*, the court found that under the *Mathews* test, prison officials' proven interest in having "a single, unitary grievance procedure, and not a variety of processes tailored to fit anticipated, hypothetical circumstances," outweighed Lovelace's private liberty interest. 2007 WL 2461750, at *21. The court noted that within days of initiating complaints through the prison grievance procedure, Lovelace

- 22 -

"received the attention of the prison's top administration." *Id.*, at *21 n.29. Given the nature of the complaint in *Lovelace II*, local prison administrators were in a position to investigate the officer's alleged misidentification of Lovelace and to correct the situation immediately if warranted to protect Lovelace's rights.

In the instant case, local prison officials told Lovelace from the first day he complained about the two-meal Ramadan diet that the problem could not be corrected by local officials. In response to Lovelace's Level I grievance to the KMCC warden and in his Level II appeal to the regional director, he was informed that KMCC officials had acted according to VDOC policy and could not make changes to the Ramadan procedures. The regional director's grievance appeal response stated that Level II was the last level of appeal for the issue raised.[9] However, a Level III appeal is available under the VDOC grievance procedures as to some issues.[10] *See Couch*,

---

[9] Lovelace complains that the regional director should have indicated in the Level II response that Lovelace could proceed on appeal to Level III, since he was challenging a policy under the control of VDOC administrators not involved in the first two levels of the grievance procedure. This claim of negligence by the regional director, however, does not state any claim actionable against him in his individual capacity. *Lovelace*, 472 F.3d at 202. Moreover, as inmates have no constitutional right to a prison grievance procedure, an official's failure to comply with his prescribed duties under an established grievance procedure does not violate inmates' constitutional rights. *See Adams v. Rice*, 40 F.3d 72, 75 (4th Cir. 1994).

[10] None of the parties submit as an exhibit a copy of the VDOC grievance procedures in force in 2004-2005, when this action arose. Lovelace submits a copy of the current grievance procedure, DOP 866.1, implemented November 1, 2007, which states: "Grievances appealed to the Deputy Director or Director's Office will be reviewed to determine if they qualify for a response by this level . . . [and] [g]rievances, which qualify for a Level III decision will be responded to . . . as appropriate." (Pl.'s Resp., Ex. G, sec. VI(C)(3)(d).)

- 23 -

479 F. Supp. 2d at 577-78 (reciting elements of VDOC grievance procedures, DOP 866).[11]

I find no genuine issue of material fact in dispute as to whether the VDOC grievance procedures are adequate under *Mathews*. As an initial matter, Lovelace could have presented his Ramadan calories complaint through all three levels of the VDOC grievance procedures after completion of Ramadan 2004 in order to bring the problem to the attention of VDOC administrators who had authority to remedy the problem before Ramadan 2005. Although Lovelace asserts that he received only two meals a day during Ramadan 2004, he does not explain his failure to complete the grievance procedures at that time.

Moreover, I find that even if Lovelace first received notice of the two-meal system on the first day of Ramadan 2005, as he alleges, the existing grievance procedures were adequate under *Mathews* to protect his interests. First, the weight of Lovelace's interest here is defined by the effect of the deprivation on his religious exercise. The two-meal Ramadan program did not completely deprive him of his ability to participate in the Ramadan observance. The existing state-wide policy accommodated the religious belief that he should refrain from eating during daylight hours. Lovelace's grievances, then, were requesting an adjustment to the

---

[11] Although Couch's free exercise and RLUIPA claims were similar to those that Lovelace presents concerning the nutritional inadequacy of the two-meal Ramadan plan, Couch based his related due process and equal protection claims on different facts than Lovelace does. *Couch*, 479 F. Supp. 2d at 590-91. Therefore, the court in the *Couch* case did not address the issue of whether the VDOC administrative remedies procedure is adequate under *Mathews* to protect inmates' interest in adequate accommodation of Ramadan practices.

accommodation. However, his interest in receiving more calories during the fast does not sway the balance under *Mathews* as heavily as did his complaint in *Lovelace II* that he had been deprived altogether of the right to observe the Ramadan dusk to dawn meal schedule and to participate in other Ramadan religious services. By contrast, in the instant case, the deprivation of the third meal caused him, at most, hunger headaches that did not require medical treatment, minor weight loss, and some distraction from his religious observance. Indeed, Lovelace does not allege that ingesting fewer calories per day during Ramadan violated his religious beliefs in any way.

As to the second prong of the *Mathews* test, the so-called "erroneous deprivation" in this case was an inadvertent failure of VDOC officials to recognize that three Common Fare meals during Ramadan is consistent with Islamic beliefs. Since the policy has now been changed to require three meals, the risk of a similar deprivation is low and can now be corrected at the local level through the initial stages of the grievance procedures. For the same reason, additional procedures by which to bring similar "deprivations" to the attention of VDOC administrators are not warranted.

The third prong of *Mathews* weighs the state's interests. As discussed, the state has a strong interest in centralizing all decisions regarding accommodation of inmates' religious beliefs, an interest to which the court must defer. This interest encompasses a need to allow time for study and consideration of requested adjustments to the state-wide accommodation policy. Given the equally strong state

- 25 -

interest in having a unified grievance procedure, I find that Level III of the existing grievance procedure as a post-deprivation remedy was sufficient to give officials' timely notice of the deprivation in this case and a chance to remedy it if warranted before the next celebration of Ramadan. As the state's interests clearly outweigh Lovelace's interest in this case, I find that existing grievance procedures were adequate under *Mathews*, and I will grant the motion for summary judgment on the due process claim accordingly.

## C. EQUAL PROTECTION.

The Equal Protection Clause prohibits governmental decision makers from treating differently persons who are in all relevant respects alike. *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 440, (1985); *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001). An inmate claiming violation of this right must first demonstrate that he has been "treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination." *Morrison*, 239 F.3d at 654.

Lovelace claims that since inmates on the regular KMCC menu receive the same number of calories in two meals on weekend days as they would in three meals on ordinary days, it violated his rights to receive fewer calories in two meals every day during Ramadan.[12] This comparison fails to state an equal protection claim because as an inmate on the Common Fare meal schedule during Ramadan, Lovelace

---

[12] On weekends and holidays in 2005, except during Ramadan, Lovelace allegedly received all three of his Common Fare meals.

Case 7:07-cv-00506-JPJ-mfu   Document 33   Filed 09/29/09   Page 26 of 27   Pageid#: 307

is not similarly situated to other inmates on other menus.  I will grant defendants'
Motion for Summary Judgment as to Lovelace's equal protection claim.


                                         III

        For the stated reasons, I find that defendants are entitled to summary judgment
as to all of Lovelace's claims.  I also find no reason to allow Lovelace to amend to
name other defendants, because he presents no genuine issue of material fact.  I also
find that his demand for injunctive relief is moot.

        A separate Final Order will be entered herewith.

                                         DATED: September 29, 2009

                                         /s/ James P. Jones
                                         Chief United States District Judge